**Slip Op. 10-122**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THAI PLASTIC BAGS INDUSTRIES CO., LTD., *et al.*<br><br>                    Plaintiffs,<br><br>              v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>              and<br><br>POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, *et al.*<br><br>                    Defendant-Intervenors. | Before: Pogue, Judge<br><br>Court No. 09-00537<br><br>**Public Version** |

### OPINION AND ORDER

[Plaintiffs' motion for judgment upon the agency record DENIED.]

Dated: October 26, 2010

Hughes Hubbard & Reed LLP (Kenneth J. Pierce, Robert L. LaFrankie, and Victor S. Mroczka) for the Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Carrie A. Dunsmore) for the Defendant.

King & Spalding, LLP (Stephen A. Jones and Daniel L. Schneiderman) for the Defendant-Intervenors.

**Pogue, Judge:** In this action, producers/exporters Thai Plastic Bags Industries Co., Ltd., Apec Film Ltd., and Winner's Pack Co., Ltd. (collectively "TPBG" or Plaintiffs) challenge the cost

calculation methodology used to determine their dumping margin in the final results of the U.S. Department of Commerce's ("Commerce" or "the Department") administrative review[1] of the antidumping duty ("AD") order on polyethylene retail carrier bags ("plastic bags") from Thailand.[2]  Specifically, in their current motion for judgment on the agency record, Plaintiffs object to Commerce's adjustment of Plaintiffs' submitted data -- regarding the fixed overhead ("FOH"), variable overhead ("VOH"), and per-unit labor costs ("labor") of their goods -- in Commerce's sales-below-cost test and calculation of constructed value("CV").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a).

Because Plaintiffs' main challenges here contradict their arguments as presented before the agency in the administrative review, and because other challenges were not presented to the agency at all, as is more fully explained below, the court denies Plaintiffs' motion.

---

[1] Original AD determinations are subject to Commerce's periodic review, including yearly reviews conducted upon request from interested parties. See Tariff Act of 1930, § 751, 19 U.S.C. § 1675(a)(2006).  Future references to the Tariff Act of 1930 will be to Title 19 of the United States Code, 2006 Edition.

[2] See Polyethylene Retail Carrier Bags from Thailand, 74 Fed. Reg. 65,751 (Dep't Commerce Dec. 11, 2009) (final results of AD administrative review) ("Final Results"), and accompanying Issues and Decision Memorandum, A-549-821, AR: 8/01/07 - 07/31/08 (Dec. 7, 2009), Admin. R. Pub. Doc. 100 ("Decision Mem.").

## Background

This action involves the fourth administrative review of the original 2004 AD investigation of the subject merchandise.[3]  That original determination, <u>Polyethylene Retail Carrier Bags from Thailand</u>, 69 Fed. Reg. 34,122 (Dep't Commerce June 18, 2004) (notice of final determination at less than fair value), amended by, <u>Polyethylene Retail Carrier Bags from Thailand</u>, 69 Fed. Reg. 42,419 (Dep't Commerce July 15, 2004) (notice of amended final determination of sales at less than fair value), assessed an AD margin for Plaintiffs of 2.26 percent.[4] <u>Polyethylene Retail Carrier Bags From Thailand</u>, 69 Fed. Reg. 48,204, 48,205 (Dep't Commerce Aug. 9, 2004) (AD order).

## I. Commerce's Review Determination

TPBG requested this fourth administrative review, on September 2, 2008, <u>see</u> Polyethylene Retail Carrier Bags from Thailand: Request for Administrative Review, A-549-821, POR: 8/1/07 - 7/31/08 (Sept. 2, 2008), Admin. R. Pub. Doc. 2, and Commerce then initiated

---

[3] As noted, the investigated or "subject" merchandise at issue are plastic bags.  These plastic bags are sometimes called grocery bags, merchandise bags, t-shirt sacks or checkout sacks, and are generally defined as non-sealable and with handles, along with specified thickness, length and depth ranges. TPBG produces all of these bags in Thailand, and the plastic bags are normally provided free of charge  by retailers to customers in order to help them package their purchases. <u>Final Results</u> at 65,751.

[4] The dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. §1677(35)(A).

the review. <u>Initiation of Antidumping and Countervailing Duty</u>

<u>Administrative Reviews and Requests for Revocation in Part</u>, 73 Fed.

Reg. 56,795, 56,796 (Dep't Commerce Sept. 30, 2008).   Commerce's

preliminary determination followed, in August 2009. <u>Polyethylene</u>

<u>Retail Carrier Bags from Thailand</u>, 74 Fed. Reg. 39,928 (Dep't

Commerce Aug. 10, 2009) (preliminary results of antidumping duty

administrative review) ("<u>Preliminary Results</u>").

In the Preliminary Results Memorandum, incorporated by

reference in the Preliminary Results, Commerce matched U.S. models

to foreign-market models in order to make the appropriate price of

sales comparisons.[5] [6]   In order to appropriately compare

---

[5] Unique models of subject merchandise and analogous
foreign like products are assigned control numbers ("CONNUM").
<u>See</u> (Mem. in Supp. of Pls.' Mot. for Summ. J. on the Agency R.
("Pls.' Br.") 5 n.2; Def.'s Opp. to Pls.' Mot. for J. Upon the
Agency R. ("Gov't Response Br.") 3.)  Foreign-market and exported
CONNUMs are referred to as "CONNUMHs" and "CONNUMUs,"
respectively. <u>See</u> Request for Information, Polyethylene Retail
Carrier Bags from Thailand, A-549-821, 8/1/2007 - 7/31/2008 (Nov.
25, 2008), Admin R. Pub. Doc. 14 at B-5, C-5.
    Commerce matched CONNUMUs to CONNUMHs "according to the
following methodology, in descending order of preference":

    1)   We found the identical home-market model according
         to the abbreviated product code (CONNUMH). We made
         comparisons to weighted-average home-market prices
         that were based on all sales which passed the cost
         test of the identical products. . . .

    2)   If no identical match was found, we matched the
         similar merchandise on the basis of the
         comparison-model market which was closest in terms
         of the physical characteristics to the model sold
         in the United States. These characteristics are,
         in order from most important to least important
         for purposes of our selection, 1) quality, 2) bag

the matched sales, Commerce adjusted the FOH, VOH, and labor

amounts, as they had been allocated in TPBG's submission,[7] to

---

> type, 3) length, 4) width, 5) gusset, 6)
> thickness, 7) percentage of high-density
> polyethylene resin, 8) percentage of low-density
> polyethylene resin, 9) percentage of low linear-
> density polyethylene resin, 10) percentage of
> color concentrate, 11) percentage of ink coverage,
> 12) number of ink colors, and 13) number of sides
> printed.  We made comparisons to weighted-average
> home-market prices that were based on all sales
> which passed the cost test of the most similar
> product. . . .

> 3)   For those U.S. models for which no identical or
>      similar match was found, the CV of the U.S. model
>      was used as the basis for normal value.

Polyethylene Retail Carrier Bags from Thailand - Thai Plastic
Bags Industries Group (TPBG), Preliminary Results Analysis
Memorandum, A-549-821, AR 8/1/07 - 7/31/08 (Aug. 10, 2009),
Admin. R. Conf. Doc. 29 ("Preliminary Mem.") at 2.

[6] In some cases, Commerce found "U.S. models for which no
identical or similar [home market] match" existed on the record,
Preliminary Mem. at 2, and "found that there were some models for
which [Commerce] had to disregard sales below cost." Id. at 6.
Thus, Commerce "calculated normal value based on CV when [it] did
not find an identical or similar model in the home market or when
the identical or similar model was disregarded as below cost."
Id.  Commerce moreover "calculated [CV] . . . [by] includ[ing]
the cost of materials and fabrication, adjusted [to eliminate
cost differences attributable to factors other than physical
characteristics] . . . ." Preliminary Results, 74 Fed. Reg. at
39,932.
      There were [[
            ]] and, therefore, [[
                              ]]. (Def.-Intervenors' Opp'n
to Pls.' Mot. for J. Upon the Agency R. ("Def.-Interventors'
Mem.") 5 n.4.)

[7] In its administrative review, Commerce served
questionnaires on the Plaintiffs who, as "respondents," were
required to respond with requested information.

assure that the allocated costs were appropriate. As Commerce explained:

> TPBG's reported COP and CV data indicate considerable cost disparities among products with similar physical characteristics.[8] . . . TPBG explained that, because the Rayong facility is more efficient than the Sampran facility, the per-kg costs at the Rayong facility are lower than the costs at the Sampran facility. . . . TPBG explained that it produces more home-market products at the Sampran facility and more export products at the Rayong facility. . . . TPBG explained that priority is given to U.S. production runs over home-market production runs. Specifically, TPBG explained that U.S. production runs are run on a continuous basis whereas home-market production runs are often interrupted for priority export runs. TPBG explained that the stop and go for domestic production results in greater production inefficiencies.

> [I]t is unreasonable to attribute the starts and stoppages, and associated inefficiencies, mainly to the home-market products. By TPBG's own admission, the cause of the stoppages is management's own internal decision concerning the export and home-market production runs and not due to production activities or requirements of the domestic product. Accordingly, we determine that the cost differences created by TPBG's methodology are not attributable to the physical differences between the home-market and U.S. products.

> [19 C.F.R. § 351.411] states, "{t}he Secretary will not consider differences in [COP] when compared merchandise has identical physical characteristics." In

---

[8] For example, for CONNUM [[                    ]] (U.S. product), TPBG reported an output of [[      ]], direct material costs of [[         ]], direct labor costs of [[           ]], variable overhead of [[            ]], and fixed overhead of [[             ]. For CONNUM [[                    ] (home-market product) TPBG reported an output of [[          ]], direct material costs of [[                ]], direct labor costs of [[              ]], variable overhead of [[              ]], and fixed overhead of [[             ]].

[Stainless Steel Bar from the United Kingdom[9]] and
accompanying Issues and Decision Memorandum at Comment 1,
we reaffirmed our policy that we would determine whether
cost differences may affect the accuracy of the margin
calculation, when such cost differences are attributable
to factors beyond physical characteristics (such as
situations where the merchandise is produced at separate
facilities or the cost differences are high even though
the physical differences appear small).   In such
instances, we have adjusted costs to address the
distortion. See, e.g., [Hot-Rolled Flat-Rolled Carbon-
Quality Steel Products From Japan[10]] at Comment 22; Small
Diameter Circular Seamless Carbon and Alloy Steel,
Standard, Line and Pressure Pipe From Brazil[11]] at
Comment 2. [W]e [] adjusted the per-unit labor, VOH, and
FOH costs of each product, by averaging most of these
costs across all product lines, to eliminate the
distortion caused by TPBG's allocation methodology.

Preliminary Mem. at 3-4 (citations omitted). Accord Preliminary

Results, 74 Fed. Reg. at 39,932.  The adjusted costs were then used

in Commerce's computation of the cost of production ["COP"] and CV

of those matched foreign models.

    Relevant  to  the  litigation  here,  TPBG  then  contested

Commerce's preliminary determination, arguing that Commerce should

use TPBG's reported costs, without Commerce's adjustments, because

"[t]he TPBG cost methodology correctly allocates additional costs

---

[9] Stainless Steel Bar from the United Kingdom, 72 Fed. Reg.
43,598 (Dep't Commerce Aug. 6, 2007) (final results of AD
administrative review).

[10] Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From
Japan 64 Fed. Reg. 24,329 (Dep't Commerce May 6, 1999) (notice of
final determination of sales at less than fair value).

[11] Small Diameter Circular Seamless Carbon and Alloy Steel,
Standard, Line and Pressure Pipe From Brazil, 60 Fed. Reg. 31,960
(Dep't Commerce June 19, 1995).

to those products which require additional time to process, with products which require less time to process having fewer costs allocated to those products." Thai Plastic Bags Group ("TPBG") Case Brief, A-549-821, ARP 8/1/2007 - 7/31/2008 (Sept. 9, 2009), Admin. R. Conf. Doc. 1489, ("Pls.' Case Br.") at 1.  TPBG stated that it "based its reported costs on actual cost and production records maintained in the ordinary course of business." Id. at 2.[12] Importantly, TPBG also argued that if Commerce determined that it was necessary to adjust TPBG's cost allocation, the adjustment should be, contrary to the petitioners' position, applied to all costs used in the calculation.[13]  Thai Plastic Bags Group ("TPBG") Rebuttal Brief, A-549-821, ARP 8/1/2007 - 7/31/2008 (Sept. 14, 2009), Admin. R. Conf. Doc. 1494,("Pls.' Rebuttal Br.") at 1. See also id. ("Either [Commerce] should use the revised costs for **all** purposes in its calculations, or it should not revise the costs at all.") (emphasis in original).[14]

---

[12] TPBG points out that it "has been using the same cost accounting system and the same methodology in the U.S. antidumping proceedings involving [plastic bags] from Thailand since 2004." Id. at 1.

[13] TPBG specifically argued that the cost adjustment should not be limited to Commerce's DIFMER adjustment.  See infra pp. 16-17.

[14] TPBG argued:

[Stainless Steel Bar, 72 Fed. Reg. 43598] states that [Commerce] has concerns when a respondent has provided cost data which might affect the accuracy of the results, such as 'when such cost differences are

After considering TPBG's argument, Commerce concluded, in its

Decision Memorandum, that "[b]ecause TPBG's reported conversion

---

attributable to factors beyond physical characteristics
(such as situations where the merchandise is produced
at separate facilities or the cost differences are high
even though the physical differences appear small). . .
. Stainless Steel Bar expresses [Commerce's] concerns
in such situations that relate to all aspects of
[Commerce's] calculations, not just the [DIFMER]
calculation. . . . In fact, [Commerce's] primary
concern in Stainless Steel Bar related to how that
respondent's use of job-order costs for each CONNUM
could distort the sales below cost test[.] . . . Thus,
[Commerce] was primarily concerned with the potential
effects on the sales below cost test. [Commerce] went
on to stress that distortions in cost arising from
timing and other non-physical characteristic factors
could affect the sales below cost test[.] . . . In
other words, [Commerce] was concerned that the cost
distortions could be used to manipulate the margin
through the sales below cost test. [Commerce] went on
to state that such distortions could also affect the
[DIFMER] adjustments, but it is apparent that the sales
below cost test [and by extension the calculation of
CV] remains the primary concern[.] . . . Adjusting the
reported costs only for purposes of the [DIFMER]
adjustment merely replaces one set of purported
distortions with another set of distortions.  In other
words, if [Commerce] is to achieve its goal of
calculating an accurate dumping margin, then any
adjustment to the costs must be applied consistently
throughout the calculation . . . . [I]f [Commerce]
insists on revising [labor, VOH, and FOH], then
[Commerce's] objective of ensuring an accurate dumping
calculation with respect to all parts of that
calculation mandates that [Commerce] should apply those
revisions throughout the entire calculation.
[Commerce] thus should follow the Stainless Steel Bar
reasoning and continue to apply the cost revisions for
all purposes, for the [DIFMER] adjustments, the sales
below cost test[,] and the calculation of [CV].

Id. at 2-4, 6 (citations and footnote omitted).   The reader will
note that this position is directly contrary to TPBG's current
position before the court. See infra.

costs resulted in product-specific cost differences which were unrelated to differences in physical characteristics, [Commerce] could not use TPBG's reported costs . . . ." <u>Decision Mem.</u> at 3. Commerce stated:

> We disagree [with petitioners/Defendant-intervenors] . . . that we should use TPBG's reported costs for the purposes of the sales-below-cost test and the calculation of constructed value. Normally, the product costs a respondent reports should reflect cost differences attributable to the different physical characteristics we define to ensure that the product-specific costs we use for the below-cost test reflect the corresponding product's physical characteristics accurately without hiding extraneous factors that may affect differences in costs. In addition, [19 U.S.C. § 1677b(a)(6)(C)(ii)] requires that we account for and adjust for any differences attributable to physical differences between subject merchandise and foreign like product if similar products are compared. For this purpose, [19 C.F.R. § 351.411(b)] directs us to consider differences in variable costs associated with the physical differences in the merchandise, i.e., the difference-in-merchandise adjustment. Normally, we use a respondent's product-specific costs (that reflect cost differences attributable to our defined physical characteristics as described above) for the below-cost test. See [19 U.S.C. § 1677b(b)(1)] . Similarly, the product-specific costs should incorporate differences in variable costs associated with the physical differences in the merchandise in accordance with [19 C.F.R. § 351.411(b)] and be used for the difference-in-merchandise adjustment. In contrast, where a respondent's reporting methodology results in cost differences extraneous to our identified physical characteristics, we may not rely on a respondent's reported methodology. . . .

> In the less-than-fair-value investigation of PRCBs from Malaysia, we calculated different costs of production to use for the below-cost test and the difference-in-merchandise adjustment. See Malaysia PRCB LTFV and accompanying I&D Memo at Comment 5. We do not consider our decision in that investigation to be consistent with our normal practice of calculating a single cost of production for both the sales-below-cost

test and the difference-in-merchandise adjustment, even
in cases in which we revised material costs to neutralize
the cost differences resulting from extraneous factors
other than differences in the physical characteristics.
See, e.g., [Stainless Steel Bar from the United Kingdom,
72 Fed. Reg. 43,598 (Dep't Commerce Aug. 6, 2007) (final
results of AD administrative review) ("UK SSB"), and
accompanying I&D Memo at Comment 1].

Decision Mem. at 3-4 (footnote omitted).

Finally, Commerce reasoned that "although TPBG might have used

its actual [period of review ("POR")] and production records that

it maintains in its normal course of business as a basis for

allocating its conversion costs, TPBG has acknowledged that its

allocation methodology, which was developed for dumping purposes,

is a departure from its normal cost-accounting system." Id. at 4-5.

Thus, Commerce concluded, "[Commerce's] adjustment does not

represent a departure from TPBG's normal books and records." Id. at

5.

As a consequence of its determinations, Commerce assessed an

AD margin of 21.99 percent for TPBG for the fourth administrative

review. Final Results, 74 Fed. Reg. at 65,752.


## II. Legal Framework

In calculating the normal value of subject merchandise

originating from a market economy country, such as Thailand,

Commerce must follow the rules laid out in 19 U.S.C. § 1677b(a)-

(b), (d)-(f).[15]  Pursuant to this statutory instruction, Commerce

must first attempt to determine a "price" to use as a normal value,

more specifically, "the price at which the foreign like product is

first sold . . . for consumption in the exporting country, in the

usual commercial quantities and in the ordinary course of trade,

and, to the extent practicable, at the same level of trade as the

export price or constructed export price." Id. § 1677b(a)(1)(B).

As indicated above, in order to ascertain this "price," Commerce

tries to match the subject merchandise to "foreign like

product[s]."[16]

**A. Sales Below Cost**

In its calculation of the price of the foreign like product,

Commerce will discard certain of a respondent's reported sales.

Relevant to this matter, if Commerce determines that sales of the

foreign like product "were made at less than cost of production,"[17]

---

[15] See also id. § 1677b(a) ("In determining under this
subtitle whether subject merchandise is being, or is likely to
be, sold at less than fair value, a fair comparison shall be made
between the export price or constructed export price and normal
value.").

[16] Foreign like products are defined in 19 U.S.C. § 1677(16).
Of note, subsections (B) and (C) of 19 U.S.C. § 1677(16), which
are referenced in section 1677b(a)(6)(C)(ii), refer to foreign
like products that are not identical to subject merchandise.

[17] COP, for purposes of section 1677b, equals the sum of:

(A) the cost of materials and of fabrication or
other processing of any kind employed in producing the
foreign like product, during a period which would
ordinarily permit the production of that foreign like

it will disregard these sales. <u>Id.</u> § 1677b(b)(1).[18] As noted above, in certain circumstances, Commerce will not use the price of the foreign like product and will, instead, calculate a CV to input as the normal value.   For example, after Commerce disregards respondent's sales as less than the COP, if no foreign like product sales remain, "normal value shall be based on the [CV] of the merchandise." <u>Id.</u> § 1677b(b)(1).[19]

--------

       product in the ordinary course of business;

           (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; <u>and</u>

           (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment. . . .

<u>Id.</u> § 1677b(b)(3) (emphasis added).

   [18] These sales are only disregarded if they "have been made within an extended period of time in substantial quantities" and "were not at prices which permit recovery of all costs within a reasonable period of time[.]" <u>Id.</u> § 1677b(b)(1)(A)-(B).   Such requirements are not at issue here.

   [19] CV amounts to the sum of:

           (1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise[] . . . ["COM"];

           (2)(A) the actual amounts . . . for selling, general, and administrative expenses. . . ; <u>and</u>

           (3) the cost of all containers and coverings . . . and all other expenses incidental to . . . shipment to the United States. . . .

According to statute and regulations, Commerce uses the same method to calculate "costs" for both COP and CV.  Commerce also uses the respondent's records, provided that these records meet certain requirements. [20]

---

Id. § 1677b(e) (emphasis added).

[20]

     Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. [Commerce] shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer [].
    . . .

Id. § 1677b(f)(1)(A). Accord AD Manual 70. See also Statement of Administrative Action, H.R. Rep. No. 103-316, at 834-35 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4171-72,("The exporter or producer will be expected to demonstrate that it has historically utilized [its reported] allocations . . . . In determining whether to accept the cost allocation methods proposed by a specific producer, . . . Commerce will [] consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation or review and in the normal course of its business operation.").
    The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements, both for purposes of U.S. international obligations and domestic law. . . . [S]ince this Statement will be approved by the Congress at the time it implements the Uruguay Round agreements, the interpretations of those agreements included in this Statement carry particular authority. . . . [T]he Statement describes the administrative action proposed to implement the particular agreement, explaining how the proposed action changes existing

Commerce must attempt to calculate COP and CV as accurately as possible and, to this end, Commerce is authorized to make adjustments to cost allocations.  Commerce's regulations instruct that "[i]n determining the appropriate method for allocating costs among products, [Commerce] may take into account production quantities, relative sales values, and other quantitative and qualitative factors associated with the manufacture and sale of the subject merchandise and foreign like product." 19 C.F.R. § 351.407(c). <u>Accord</u> AD Manual 71 ("We review various qualitative and quantitative factors to determine whether a <u>representative</u> measure of the materials, <u>labor, overhead</u> and other costs have been allocated to the foreign like product.  We should specifically review the <u>allocation methods</u> (e.g., production quantities and relative sales values) to determine whether an appropriate portion of common costs have been allocated to the product.") (emphasis added). <u>See also</u> SAA at 834-35, reprinted in 1994 U.S.C.C.A.N. at 4172.  Specifically, if Commerce "determines that costs [as submitted by a respondent . . . have been shifted away from production of the subject merchandise, or the foreign like product," then "[Commerce] will adjust costs appropriately, to ensure they are not artificially reduced." SAA at 835, reprinted in 1994 U.S.C.C.A.N. at 4172.

_____

administrative practice and stating why the changes are required or appropriate to implement the agreement." SAA at 656, reprinted in 1994 U.S.C.C.A.N. at 4040.

### B. DIFMER Adjustment to Price

Once Commerce computes price or CV, Commerce must then make certain "adjustments" pursuant to statute. 19 U.S.C. § 1677b(a)(6),(8). Relevant here, the "price" "shall be":

> increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price . . . that is established to the satisfaction of the administering authority to be wholly or partly due to— . . . .
>
> (ii)  the  fact  that  [nonidentical] merchandise . . . is used in determining normal value[] . . . .

19 U.S.C. § 1677b(a)(6)(C).  Commerce's regulations implementing Section 1677b(a)(6)(C), provide for this "DIFMER" adjustment. [21] [22]

---

[21] DIFMER adjustment refers to Commerce's "difference in physical characteristics" or "difference-in-merchandise" adjustment or "allowance":

> (a) Introduction. In comparing United States sales with foreign market sales, [Commerce] may determine that the merchandise sold in the United States does not have the same physical characteristics as the merchandise sold in the foreign market, and that the difference has an effect on prices. In calculating normal value, [Commerce] will make a reasonable allowance for such differences. (See section 773(a)(6)(C)(ii) of the Act.)

> (b) Reasonable allowance. In deciding what is a reasonable allowance for differences in physical characteristics, [Commerce] will consider only differences in variable costs associated with the physical differences. . . . [Commerce] will not consider differences in cost of production when compared merchandise has identical physical characteristics.

19 C.F.R. § 351.411(b); see also AD Manual at 5 ("The statutory preference is to compare the subject merchandise sold in the United States to identical articles some in the [foreign] market.

Adjustments are not made for DIFMERs "based on . . . the fact that the domestic and exported products are produced in different facilities with differing production efficiencies." AD manual 50; SAA at 828, reprinted in 1994 U.S.C.C.A.N. at 4167.[23]

### III. TPBG's Challenge

In their brief before the court, Plaintiffs argue that:

(1) Substantial Evidence Does Not Support Commerce's Factual Finding that Physically Similar Products Have Significant Cost Differences

(2) Substantial Evidence Does Not Support Commerce's Determination that Plaintiffs' Costs Are Unreasonable or Otherwise Distorted

(3) Commerce Wrongly Concluded that Plaintiffs' Cost

---

When this is not possible, [Commerce] will compare merchandise which is physically similar to the articles sold in the United States and adjust for any physical differences in the merchandise ([DIFMER]) being compared that affect the price of the merchandise . . . .").

[22] Commerce calculates the DIFMER adjustment by calculating "the variable manufacturing cost incurred in producing the differences in physical characteristics." AD Manual 49. The calculation "is based on actual physical differences in the products, and is calculated on the basis of direct manufacturing costs." Id. at 49-50 "Direct" manufacturing costs utilized by Commerce in the DIFMER analysis "include[s] the cost of materials, labor and variable factory overhead," id. at 50, but does not include fixed costs, see 19 C.F.R. § 351.410(b).

If the DIFMER adjustment for the foreign like product exceeds 20 percent of the total COP of the subject merchandise, Commerce will not use that foreign like product. AD Manual at 7. When Commerce "determine[s] that the [DIFMER] adjustment is too great, [Commerce] select[s] a different product as most similar or, if there is no similar match, use[s] [CV] for the [normal value." Id.

[23] Moreover, because CV is based on COM of the subject merchandise, no DIFMER adjustment is made to CV. Id. at 58.

Differences Are Not Attributable to the Physical
Differences of the Merchandise

(4) The Difference-In-Merchandise Adjustment Standard Should
Not Be Used for the Purposes of the Sales-Below-Cost and
Constructed Value Calculations

(5) Commerce's Reliance on Previous Administrative
Determinations -- to Support its Rejection of Plaintiffs'
Reported Costs Not Attributable to Physical Differences
of the Merchandise -- is Misplaced

**Standard of Review**

Applying the familiar standard for reviewing Commerce's
decision, the court "shall hold unlawful any determination,
finding, or conclusion found . . . to be unsupported by substantial
evidence on the record, or otherwise not in accordance with law."
19 U.S.C. § 1516a(b)(1)(B)(i). See also United States v. Eurodif
S.A., __ U.S. __, 129 S. Ct. 878, 886 (2009).

**Analysis**

Essentially, Plaintiffs challenge two aspects of Commerce's
final determination. First, TPBG contends that Commerce improperly
applied the "physical differences" test, associated with the DIFMER
adjustment, to the sales-below-cost test and the constructed value
calculation.[24]   Second, TPBG asserts that, assuming Commerce's use

---

[24] This is the gravamen of Plaintiff's fourth and fifth
arguments to the court, that:

(4) The Difference-In-Merchandise Adjustment Standard
Should Not Be Used for the Purposes of the Sales-Below-
Cost and Constructed Value Calculations [and that]

(5) Commerce's Reliance on Previous Administrative

of this test was proper, Commerce did not support its determination

to adjust TPBG's submitted numbers with substantial evidence.[25]

The court will address each of Plaintiffs' challenges in turn.

**A. Legality of Commerce's Adjustment Pursuant to its "Physical Characteristics" Test**

Plaintiffs' argument on this issue is barred by judicial

estoppel. "[W]here a party assumes a certain position in a legal

proceeding, and succeeds in maintaining that position, he may not

thereafter, simply because his interests have changed, assume a

contrary position, especially if it be to the prejudice of the

party who has acquiesced in the position formerly taken by him."

New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Davis v.

Wakelee, 156 U.S. 680, 689 (1895)). See also Trs. in Bankr. of N.

Am. Rubber Thread Co. v. United States, 593 F.3d 1346, 1353-54

(Fed. Cir. 2010); Scarano v. Cent. R. Co., 203 F.2d 510, 513 (3d

Cir. 1953).[26]

_____

Determinations -- to Support its Rejection of
Plaintiffs' Reported Costs Not Attributable to Physical
Differences of the Merchandise -- is Misplaced

[25] This is the gravamen of Plaintiff's second argument to the
court, that:

(2)   Substantial Evidence Does Not Support Commerce's
Determination that Plaintiffs' Costs Are Unreasonable
or Otherwise Distorted

[26] Judicial estoppel is "is an equitable doctrine invoked by
a court at its discretion[.]" New Hampshire, 532 U.S. at 750

The Federal Circuit has made it clear that "[j]udicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts." Trs. in Bankr. of N. Am. Rubber Thread Co., 593 F.3d at 1353-54 (citing Lampi Corp. v. Am. Power Prods., Inc., 228 F.3d 1365, 1377 (Fed. Cir. 2000) ("The [judicial estoppel] doctrine also applies to administrative proceedings in which a party obtains a favorable order by making an argument that it seeks to repudiate in a subsequent judicial proceeding."))("Turning to the remaining issue, we find that NART is precluded by the doctrine of judicial estoppel from arguing in the CIT in favor of a revocation date of October 1, 1995, given its earlier successful argument to Commerce that a revocation date of October 1, 1995, was inappropriate."). Thus, judicial estoppel applies here, where the court is reviewing an agency decision rather than a decision of a lower court.

---

(citation and quotation marks omitted).  This doctrine can be applied to questions of law. Transclean Corp. v. Jiffy Lube Int'l, Inc., 474 F.3d 1298 (Fed. Cir. 2007).  Although neither party has raised this issue before the court, "the doctrine can be raised by courts *sua sponte* because judicial estoppel concerns the integrity of the judicial system independent of the interests of the parties." In re Airadigm Communc'ns, Inc., 616 F.3d 642, 661, Nos. 08-3585, 08-3587, 08-3588, 08-3590, 2010 WL 3024876, at *17 n.14 (7th Cir. Aug. 4, 2010) (citing Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524, 530 (5th Cir. 2000) ("[B]ecause that doctrine protects the judicial system, [the court] can apply it *sua sponte* in certain instances.")(citations omitted)).  *Sua sponte* application of judicial estoppel is "especially" warranted in "egregious case[s] wherein a party has successfully asserted a directly contrary position." Beall v. United States, 467 F.3d 864, 870 (5th Cir. 2006).

Three non-exclusive factors frame the application of judicial estoppel. New Hampshire, 532 U.S. at 750-51. First, "a party's later position must be clearly inconsistent with its earlier position." Id. at 750 (citations and quotation marks omitted). Second, the court considers whether a party has "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled[.]" Id. (citations and quotation marks omitted). Third, the court considers "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 750-51 (citations omitted). See also Scarano v. Cent. R. Co., 203 F.2d 510, 513 (3d Cir. 1953) ("A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate.").

Application of the Supreme Court's three factors weighs in favor of applying judicial estoppel in this case. First, TPBG's position before this court is "directly" and "clearly" contrary to

its position before Commerce during the administrative review.
Below, Plaintiffs argued that the same concerns -- the need for
cost differences to be based upon physical differences -- underlie
the DIFMER, the sales below cost, and the CV calculations. Pls.'s
Rebuttal Br. at 1-4, 6.   This argument was made directly in
response to the petitioners' request that Commerce use TPBG's
reported costs for COP and CV, while using adjusted costs for
DIFMER. Decision Mem. at 3.   Currently, before the court,
Plaintiffs argue that Commerce improperly "applied the wrong legal
standard in making [its] decision [that TPBG's costs were
'distorted' for purposes of the sales below cost test and CV]
(i.e., Commerce applied the DIFMER 'physical differences' test)."
(Mem. in Supp. Of Pls.' Mot. for J. on the Agency R. ("Pls.' Mem.")
at 2.)   But before the agency, Plaintiffs claimed that if the
agency revised costs for DIFMER purposes, it must do so for all
purposes, including COP and CV.   Basically, before the court, TPBG
argues that Commerce cannot take physical differences into account
when determining whether to accept reported costs for the purposes
of COP and CV, and may only address those physical differences in
the DIFMER adjustment; at the same time, TPBG argued before
Commerce that when calculating COP, CV, and DIFMER, Commerce should
use the same costs adjusted to reflect cost differences

attributable to physical differences in the merchandise.[27]   Thus,

in the administrative proceeding, Plaintiffs argued for the same

across the board adjustments to costs for each purpose; here

Plaintiffs argue against such adjustments.   These two positions are

not reconcilable.

Second, Plaintiffs succeeded in its argument before Commerce.

See Decision Mem. at 3-4 ("We disagree with petitioners' argument,

however, that we should use TPBG's reported costs for the purposes

of the sales-below-cost test and the calculation of constructed

value. . . . Therefore, for the final results, to limit the

distortive effect of cost differences that are unrelated to

differences in physical characteristics, we have continued to . .

. use the adjusted cost for the sales-below-cost test, the [DIFMER]

adjustment, and constructed-value calculations."). Id. at 3-4.

Third, TPBG would "derive an unfair advantage or impose an

unfair detriment" on the government if allowed to switch their

position on this issue here.   For these reasons, Plaintiffs claim

on this issue is barred.[28]

---

[27] In its memorandum before the court, TPBG states that
"Commerce properly used one set of costs for [DIFMER, CV, and COP
for sales below cost], but it improperly 'adjusted' them before
doing so." (Pls.' Mem. at 2.)  This argument does not make sense.
TPBG is not challenging Commerce's adjustment of costs for
purposes of calculating the DIFMER adjustment

[28]    The court also notes that TPBG would be unlikely to
prevail on the merits of this issue.  In its determination,
Commerce decided to revise TPBG's cost allocations (regarding
direct labor, variable overhead and fixed overhead costs) to

**B. Evidence Supporting Commerce's Rejection of Plaintiffs' Reported Costs Pursuant to 19 U.S.C. § 1677b(f)(1)(A)**

TPBG argued below that Commerce should use TPBG's reported costs because (1) TPBG has been using the same cost system from Thailand since 2004 and even the European Commission has verified the costs, and (2) "TPBG based its reported costs on actual cost and production records maintained in the ordinary course of business," i.e., TPBG's reported cost methodology "correctly allocates additional costs to those products which require

---

eliminate a "distortion" based on factors not attributable to physical characteristics. 74 Fed. Reg. 39, 931. As noted, Commerce reallocated TPBG's costs for the sales-below-cost test, the constructed-value calculations and the difference-in-merchandise adjustment. Id. The governments' legal determination to apply its adjustment for all three purposes was reasonable because the calculation of costs "reasonably reflect[ed]" the associated costs of production and sales. See 19 U.S.C. § 1677b(f)(1)(A). As the SAA explains, Commerce must use a methodology that reasonably captures all of the costs incurred in manufacturing and selling the product at issue. SAA at 835. Further, "if Commerce determines that costs, including financing costs, have been shifted away from the production of the subject merchandise, or the foreign like product, it will adjust costs appropriately, to ensure they are not artificially reduced. Id. See NTN Bearing Corp. of America v. U.S., 368 F.3d 1369, 1374 (Fed. Cir., 2004)("Commerce noted that it 'does not rely on a respondent's reported costs solely for the calculation of COP and CV,' Final Results, 63 Fed.Reg. at 2574, and concluded that it would be distortive to adjust those costs only for those calculations, but not for others in which they were used. Id. ('[I]f we determine a component of a respondent's COP and CV is distortive for one aspect of our analysis, it is reasonable to make the same determination with respect to those other aspects of our margin calculations where we relied on the identical cost data.'). We concur with Commerce's analysis and hold that it did not err in interpreting these provisions to permit it to employ affiliated supplier cost data to calculate cost deviations to limit the definition of similar merchandise, the difmer adjustment, and inventory carrying costs.").

additional time to process, with products which require less time to process having fewer costs allocated to those products." Pls.' Case Br. at 1-2.

But Commerce rejected, in part,[29] TPBG's reported cost allocations, as the record indicated that "TPBG has acknowledged that its allocation methodology, which was developed for dumping purposes, is a departure from its normal cost-accounting system." Decision Memo at 4-5. In addition, "TPBG's reported conversion costs resulted in product-specific cost differences which were unrelated to differences in physical characteristics," id. at 3, but rather were based, by TPBG's admission, on management's internal decision "concerning the export and home-market production runs and not due to production activities or requirements of the domestic product." Preliminary Mem. at 4. Absent proof of physical differences, Commerce was compensating for a price distortion through a reallocation of costs to more accurately describe the cost structure. These conclusions follow from a reasonable reading of the record and are therefore supported by substantial evidence. See Nippon Steel Corp. v. United States, 458 F. 3d 1345, 1350-51 (Fed. Cir. 2006).

## C. TPBG's Remaining Arguments

The remaining arguments in Plaintiffs' brief before the court

---

[29] As noted, Commerce adjusted only Plaintiffs' FOH, VOH and labor costs. Commerce did not adjust Plaintiffs' input costs.

include: (1) "substantial evidence does not support Commerce's factual finding that physically similar products have significant cost differences," Pls.' Br. at 12-16, and (3) "Commerce wrongly concluded that Plaintiffs' cost differences are not attributable to the physical differences of the merchandise." <u>id.</u> at 20-23.   The government argues, and the court agrees, that, because Plaintiffs did not make these arguments in their case briefs before Commerce, the arguments are not appropriately reviewed here because of the preference for administrative exhaustion.

The relevant statute reflects this preference.   In civil actions challenging AD determinations, "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." <u>United States v. L.A. Tucker Truck Lines</u>, 344 U.S. 33, 37 (1952).

Exhaustion is "generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review-advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency."

Carpenter Tech. Corp. v. United States, 30 CIT 1595, 1597, 464 F. Supp. 2d 1347, 1349 (2006).

Generally, parties are "procedurally required to raise the[ir] issue before Commerce at the time Commerce [is] addressing the issue." Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)).  If Respondents "believed that the . . . issue was relevant to the Final Results" following the adverse decision by Commerce in the Preliminary Results, they "needed to include that issue in [their] case brief, as required by the regulation." Dorbest Ltd. v. United States, __ CIT __, __, 547 F. Supp. 2d 1321, 1344 (2008) (quoting Carpenter Tech. Corp., 30 CIT at 1598, 464 F. Supp. 2d at 1349), rev'd in part on other grounds, 604 F.3d 1363.  As a result of not raising these issues in their case brief, Plaintiffs "deprived the agency of the opportunity to consider these arguments in the first instance." Carpenter Tech., 30 CIT at __, 464 F. Supp. 2d at 1349.  Thus, because Plaintiffs have not preserved these issues, the court will not review them here.

## V. Conclusion

For the foregoing reasons, the court ORDERS that Plaintiffs' motion for judgment upon the agency record is denied.

Accordingly, judgment will be entered for the Defendant.  See

Court No. 09-00537                                    Page 28

<u>USCIT Rule</u> 56.2(b).


                                    <u>   /s/ Donald C. Pogue</u>
                                       Donald C. Pogue, Judge

Dated:     October 26, 2010
           New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
THAI PLASTIC BAGS INDUSTRIES CO.,
LTD., et al.

              Plaintiffs,

         v.

UNITED STATES,

              Defendant,

         and

POLYETHYLENE RETAIL CARRIER BAG
COMMITTEE, et al.

              Defendant-Intervenors.
```

Before: Pogue, Judge

Court No. 09-00537

**JUDGMENT**

     This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby
     ORDERED, ADJUDGED and DECREED that this case is DISMISSED.

                                        ___/s/ Donald C. Poque
                                        Donald C. Pogue, Judge

Dated:     October 26, 2010
           New York, N.Y.